# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *In re N.C.*, 2013 IL App (3d) 120438

---

| | |
|---|---|
| Appellate Court Caption | *In re* N.C., a Minor (The People of the State of Illinois, Petitioner-Appellee, v. Nichole G., Respondent-Appellant). |
| District & No. | Third District<br>Docket No. 3-12-0438 |
| Filed | July 25, 2013 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | The trial court's adjudication that respondent's child was neglected was reversed and the cause was remanded for a new hearing on the petition where the record showed that respondent's boyfriend, who had signed a voluntary acknowledgment of paternity, was dismissed from the proceedings pursuant to the grant of the State's motion for a declaration of nonpaternity based on DNA test results showing that the boyfriend was not the father and findings that the acknowledgment was signed under a mistake of fact, since the State had no standing to challenge the boyfriend's paternity, and the boyfriend was denied his right to attend the neglect hearing, testify, and present evidence. |
| Decision Under Review | Appeal from the Circuit Court of Peoria County, No. 12-JA-43; the Hon. Mark E. Gilles, Judge, presiding. |
| Judgment | Reversed and remanded with directions. |

Counsel on
Appeal

Louis P. Milot, of Peoria, for appellant.

Jerry Brady, State's Attorney, of Peoria (Terry A. Mertel and Mark A. Austill, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

Panel

JUSTICE McDADE delivered the judgment of the court, with opinion.

Justice Holdridge concurred in the judgment and opinion.

Justice Carter dissented, with opinion.

**OPINION**

¶ 1     The State filed a juvenile neglect petition (705 ILCS 405/2-3, 2-13 (West 2010)) seeking to have the minor child, N.C., adjudicated neglected and made a ward of the court. Respondent's boyfriend, who voluntarily acknowledged he was the father of N.C., was dismissed from the proceeding on the State's motion after a DNA test revealed he was not the biological father of the child. An adjudicatory hearing was held, and the trial court found that N.C. was neglected. After a dispositional hearing, the trial court found that N.C.'s mother was unfit, made N.C. a ward of the court, and named the Department of Children and Family Services (DCFS) as N.C.'s guardian. N.C.'s mother (respondent) appeals, arguing that the trial court erred in: (1) finding that N.C. was neglected; and (2) granting the State's motion to declare that Alfred C. was not the father of N.C. We reverse and remand.

¶ 2                                              FACTS

¶ 3     N.C. was born on February 17, 2012, and was taken into protective custody by DCFS a few days thereafter. Initially, respondent's boyfriend, Alfred C., was believed to be the father. A day after N.C. was born, Alfred signed a voluntary acknowledgment of paternity or parentage (VAP) as to N.C. The VAP provides that, by signing it, the signor understands that the VAP is the same as a court order determining the legal relationship between a father and child. The VAP also notifies the signor that he can request a genetic test as to the child's paternity, and that by signing the VAP he gives up his right to a genetic test.

¶ 4     A juvenile neglect petition was filed in the instant case as to N.C. on February 22, 2012. The petition alleged that N.C. had been subjected to an injurious environment in that: (A) respondent had previously been found unfit as to her other children in May 2009 and March 2010 in certain Tazewell County cases, and there had been no subsequent finding of fitness; (B) respondent had not completed services that would result in a finding of fitness; (C) Alfred was bipolar and was not taking his medication; (D) Alfred had anger management

issues, was recently kicked out of his sister's home, and was homeless; (E) on June 17, 2011, respondent was punched in the face by her boyfriend at the time, Joseph R.; (F) on December 20, 2009, respondent's three-year-old child was injured when the child was struck in the face by a speaker that was thrown by respondent's boyfriend at the time, Chad F.; (G) Alfred had previously made threats to children's home workers in July 1998; (H) respondent had a criminal history, which included a retail theft in 2010; and (I) Alfred had a criminal history, which included reckless conduct in 1984; battery in 1991; battery, criminal damage to property, and disorderly conduct in 1998; battery, resisting police, aggravated battery, and possession of an explosive or incendiary device in 2000; threatening a public official in 2004; harassing a witness, unlawful restraint, and resisting a police officer in 2006, and resisting a police officer in 2011.[1]

¶ 5        Respondent and Alfred were represented by separate attorneys in the proceedings and a guardian *ad litem* (GAL) was appointed to represent the interests of N.C. At one of the initial court proceedings in this case, the trial court found that Alfred was the legal father of N.C. based upon the VAP. Respondent and Alfred filed answers to the neglect petition. In her answer, respondent stipulated that the State would call witnesses at the adjudicatory hearing who would support the allegations contained in paragraphs A, C, D, E, F, H, and I, but added that after the incident described in paragraph E occurred, she called the police and terminated her relationship with that boyfriend. Respondent claimed insufficient knowledge as to paragraphs B and G and demanded strict proof as to paragraph B, but not as to paragraph G. In his answer, Alfred, who at the time was still believed to be the father, stipulated that the State would call witnesses at the adjudicatory hearing who would support all of the allegations contained in the petition, except those in paragraph G. Alfred made no response in his answer as to that paragraph, and paragraph G was later stricken.

¶ 6        During the course of pre-adjudicatory proceedings, the State moved to have Alfred's deoxyribonucleic acid (DNA) tested to determine if he was truly the father of N.C. It does not appear that any party objected to this motion, and the trial court granted the State's request. The State later received the results of the DNA test, which showed conclusively that Alfred was not the biological father of N.C. The State subsequently filed a "Motion for Declaration of Non-Paternity," alleging that the DNA test proved that Alfred was not the father of N.C.

¶ 7        A hearing was held on the motion and a Family Core caseworker was questioned by the parties, although she was not sworn prior to testifying. The caseworker stated that she was present while an integrated assessment screener inquired about Alfred and respondent's relationship, and the caseworker overheard the responses. The screener asked Alfred and respondent "when they got together," to which Alfred answered December of 2011. When the assessment screener pointed out the child was born in February of 2012, Alfred then stated they had met before then but "got together" in December. The screener did not seek

---

[1]Alfred was initially referenced in the petition as the "father." However, the petition was amended and those references were changed during or just before the adjudicatory hearing, after it was determined that Alfred was not the father of N.C.

to clarify what Alfred meant by "got together." Upon further questioning by the screener later in the intake interview, Alfred said that he and respondent had been intimate in May or June of 2011.

¶ 8    The court then heard arguments on the State's motion. All parties stipulated to the existence of the VAP and that the dispute was governed by sections 5 and 6 of the Illinois Parentage Act of 1984 (Parentage Act) (750 ILCS 45/1 *et seq.* (West 2010)). The State conceded that it could not bring an action for the nonexistence of the parent and child relationship under section 7 of the Parentage Act, but argued that it could challenge the VAP on the basis of fraud, duress, or material mistake of fact pursuant to section 6(d) of the Parentage Act. The State argued that the VAP was signed under either a mistake of fact or fraud, because the caseworker's testimony arguably indicated that Alfred and N.C.'s mother might not have had sexual relations until December 2011, well after N.C. was conceived. Both respondent and Alfred argued that the State had not met the burden of proof to challenge the VAP, and respondent argued that the State's Attorney did not have standing to undo the VAP. The GAL argued that a mistake of fact had been established, and further argued it was not in the minor's best interests for the trial court to uphold the VAP. At the conclusion of the hearing, the trial court granted the State's motion, finding that based on the DNA results "there clearly was a mistake of fact in that [Alfred] is not the biological father." The court also found that granting the motion was in the child's best interest. The trial court found that there was no just reason to delay enforcement or appeal of its ruling, and Alfred filed for leave to file an interlocutory appeal but was denied by this court. *In re N.C.*, No. 3-12-0365 (2012) (unpublished order under Supreme Court Rule 23).

¶ 9    On the same day in April 2012 that the declaration of nonpaternity was entered, an adjudicatory hearing was held on the petition. Prior to the hearing, the petition was modified to remove the references to Alfred as the father of N.C. The only testimony presented at the hearing was that of respondent. Called by her own attorney, respondent testified that in the prior juvenile cases, she had been ordered to complete random drug screens, to complete a parenting and a domestic violence class, to attend visits with her children, and to attend recommended counseling. Respondent stated that she had completed most of those requirements at one time or another but had dropped out of counseling after about five sessions because she did not feel that it was needed. Prior to argument, the State presented a factual basis for the stipulated paragraphs of the neglect petition in the form of a proffer to the trial court of the evidence the State would have presented on those paragraphs, if the allegations in those paragraphs had been contested. In addition, the court files from the prior juvenile cases as to respondent's other children were admitted as an exhibit. At the conclusion of the adjudicatory hearing, the trial court found that the State had proven all of the allegations in the petition and that N.C. was a neglected minor.

¶ 10    A dispositional hearing was later held. The dispositional report indicated that respondent and Alfred were married in March 2012. At the conclusion of the dispositional hearing, the trial court found that respondent was unfit, made N.C. a ward of the court, and named DCFS as N.C.'s guardian. Respondent appealed.

¶ 11                                    ANALYSIS

¶ 12     Respondent has raised two arguments on appeal. She argues that the trial court's finding of neglect was against the manifest weight of the evidence, and also asserts that the trial court erred by granting the State's motion for nonpaternity as to Alfred. We will first address the trial court's order declaring that Alfred was not the father of N.C. and removing him as a party from the neglect proceeding.

¶ 13     Respondent has questioned the ability of the State to bring a motion for nonpaternity as to Alfred. As an initial matter, the State argues that respondent has no standing to raise this issue on appeal because the trial court's ruling on this matter was not adverse to her interests. Standing requires some injury in fact to a legally recognized interest. *In re Estate of Wellman*, 174 Ill. 2d 335, 345 (1996). "Any party to the case may seek appellate review from a final judgment which is adverse to his interests, and whether the party was actually aggrieved does not determine his right to appeal." *St. Mary of Nazareth Hospital v. Kuczaj*, 174 Ill. App. 3d 268, 270-71 (1988). Respondent and her child have a clear interest in the issue of Alfred's status as the father because of the actual or potential economic and social support owed to the child from the legal father. That interest is strengthened by the fact that respondent and Alfred are now married. Therefore, we conclude that respondent may raise this issue on appeal.

¶ 14     Respondent asserts that as a matter of statutory construction, the State has no standing to bring a motion for the declaration of nonpaternity under the Parentage Act. In the alternative, she asserts that even if the State had standing, the motion should have been denied because the State failed to show by clear and convincing evidence that the VAP was made based upon a mistake of fact as to whether Alfred was N.C.'s natural father. The State argues that its standing to challenge a VAP is not precluded by the Parentage Act, and on the merits of its challenge, the State argues that the DNA test conclusively proving Alfred is not the biological father of N.C. was sufficient to establish a material mistake of fact.

¶ 15     As the assertions of the parties indicate, this case involves an issue of statutory construction. The principles of statutory construction are well established. The fundamental rule of statutory construction is to ascertain and give effect to the intent of the legislature. *Gaffney v. Board of Trustees of the Orland Fire Protection District*, 2012 IL 110012, ¶ 56. The most reliable indicator of that intent is the language of the statute itself. *Gaffney*, 2012 IL 110012, ¶ 56. If the statutory language is clear and unambiguous, it must be applied as written, without resorting to further aids of statutory construction. *Gaffney*, 2012 IL 110012, ¶ 56. In determining the plain meaning of statutory language, a court will consider the statute in its entirety, the subject the statute addresses, and the apparent intent of the legislature in enacting the statute. *Blum v. Koster*, 235 Ill. 2d 21, 29 (2009). A court may not depart from the plain language of the statute and read into it exceptions, limitations, or conditions that are not consistent with the express legislative intent. *Gaffney*, 2012 IL 110012, ¶ 56. The standard of review on appeal for an issue of statutory construction is *de novo*. *Gaffney*, 2012 IL 110012, ¶ 50.

¶ 16     To resolve these issues, we must look to the provisions of the Parentage Act. The Parentage Act creates a statutory mechanism for legally establishing a parent-child

relationship in Illinois. *J.S.A. v. M.H.*, 224 Ill. 2d 182, 198 (2007). The purpose of the Parentage Act is to further the public policy of this state to recognize the right of every child to the physical, mental, emotional, and monetary support of his or her parents. 750 ILCS 45/1.1 (West 2010); *J.S.A.*, 224 Ill. 2d at 198. The Parentage Act was intended "to provide for the support, maintenance and education of illegitimate children so that they [would] not become wards of the state." *Berg v. Garrett*, 224 Ill. App. 3d 619, 622-23 (1992). When parentage of a child is at issue in a civil action, the provisions of the Parentage Act shall apply. 750 ILCS 45/9(a) (West 2010).

¶ 17    The Parentage Act contains several ways to establish a father and child relationship: by presumption (750 ILCS 45/5(a) (West 2010)), by consent (750 ILCS 45/6 (West 2010)), or by judicial determination (750 ILCS 45/7 (West 2010)). *J.S.A.*, 224 Ill. 2d at 198. Two presumptions arise from a man's marriage to the mother of the child. See 750 ILCS 45/5(a)(1), (a)(2) (West 2010). Of relevance to this appeal, sections 5(a)(3) and 5(a)(4) provide that a man is presumed to be the natural father of a child if the man and the child's mother have signed a VAP in accordance with certain other statutory provisions. 750 ILCS 45/5(a)(3), (a)(4) (West 2010). The presumption of parentage resulting from a VAP becomes conclusive if the VAP is not rescinded within the earlier of (1) 60 days or (2) the date of an administrative or judicial proceeding relating to the child (including a proceeding to establish a support order) in which the signatory is a party. 750 ILCS 45/5(b) (West 2010). See also *In re Paternity of an Unknown Minor*, 2011 IL App (1st) 102445, ¶ 10 (the term "conclusive" as used in section 5 of the Parentage Act applies only to the signatories of the VAP and precludes those parties from subsequently disputing the parent-child relationship with the child). A proceeding to ratify paternity established pursuant to a VAP is neither required nor permitted. 750 ILCS 45/6(c) (West 2010). See also *Department of Public Aid ex rel. Allen v. Dixson*, 323 Ill. App. 3d 600, 602 (2001) (holding that the Parentage Act prevents a man who signed a VAP from obtaining DNA testing to determine if he is actually the biological father). Thus, under the Parentage Act "fatherhood is not always created by pure genetics." *In re Parentage of G.E.M.*, 382 Ill. App. 3d 1102, 1109 (2008).

¶ 18    The Parentage Act also contains several mechanisms for challenging an established parent and child relationship. Under section 7(b), "[a]n action to declare the nonexistence of the parent and child relationship may be brought by the child, the natural mother, or a man presumed to be the father under subdivision (a)(1) or (a)(2) of Section 5 of this Act," and the statute provides that these actions shall be brought by verified complaint. 750 ILCS 45/7(b) (West 2010). Section 7(b-5) provides that a man adjudicated to be the father under the presumptions of section 5 may file for the declaration of the nonexistence of the parent and child relationship if a DNA test establishes he is not the father. 750 ILCS 45/7(b-5) (West 2010). Section 7(b-5) does not apply to a man who has signed a VAP, however. See *People ex rel. Department of Public Aid v. Smith*, 212 Ill. 2d 389, 407 (2004). Instead, a man who voluntarily acknowledges paternity may only challenge a VAP in court under section 6(d) of the Parentage Act. *Smith*, 212 Ill. 2d at 405. Section 6(d) provides that "[a] signed acknowledgment of paternity entered under this Act may be challenged in court only on the basis of fraud, duress, or material mistake of fact, with the burden of proof upon the challenging party." 750 ILCS 45/6(d) (West 2010). The method to challenge a VAP is

through a motion under section 2-1401 of the Code of Civil Procedure (735 ILCS 5/2-1401 (West 2012)). See *Smith*, 212 Ill. 2d at 399; *Department of Public Aid ex rel. Howard v. Graham*, 328 Ill. App. 3d 433, 435-36 (2002).

¶ 19    With these provisions in mind, we turn to the issue of whether the State had standing to challenge Alfred's paternity when it filed its "Motion for Declaration of Non-Paternity" on the basis of the DNA test showing Alfred was not the biological father. First, we consider whether the State had standing under section 7(b) or 7(b-5) of the Parentage Act. Section 7(b) states that an action to declare the nonexistence of the parent and child relationship may be brought by the child, the natural mother, or a man presumed to be the father under the marital presumptions of section 5. Under section 7(b-5), a man adjudicated to be the father under the marital presumptions of section 5 may file for the declaration of the nonexistence of the parent and child relationship if a DNA test establishes he is not the father. The plain language of these statutory sections specifies which parties may bring an action to declare the nonexistence of the parent and child relationship, and we find nothing that authorizes the State to bring such a motion. As the State conceded at the trial level, it cannot file for nonpaternity under section 7(b) or 7(b-5).[2]

¶ 20    We turn next to section 6(d), which provides that a VAP may be challenged on the basis of fraud, duress, or material mistake of fact. As the State correctly points out, the section of the statute does not limit who or what party may challenge a VAP. Although there is little case law on the subject, the supreme court indicated that section 6(d) is a mechanism by which the presumed father may challenge the *voluntariness* of his acknowledgment of paternity; in essence, the father may challenge a VAP by showing his consent was procured through fraud, duress, or mistake of fact. See *Smith*, 212 Ill. 2d at 405. Here, although the State attempted to establish that Alfred signed the VAP due to a material mistake of fact, we do not believe that the State may assert this cause of action on his behalf. This court has previously determined that a mother did not have standing to challenge the paternity of the man presumed to be the father pursuant to a VAP. See *G.E.M.*, 382 Ill. App. 3d at 1117. In discussing a challenge to a VAP, we stated:

"[A] presumed father has standing to raise his own challenge to the acknowledgment of paternity based on fraud, duress, or material mistake of fact. [Citation.] The method for a father to raise such a challenge is to file a 'proper motion under section 2–1401 of the Code.' [Citations.] [The presumed father] has not personally challenged his decision to step forward as the child's legal father by filing his own section 2–1401 petition claiming fraud, duress or material mistake of fact. He has not indicated that he no longer wishes to serve in the capacity as parent. These issues must be advanced by the *father* or his attorney. Mother cannot represent father's legal interests by bringing them to the attention of the court, under the pretext of consent, when that is not evident of record in

---

[2]We note that the GAL presumably could, in the name of the child, have filed a motion to declare the nonexistence of the parent and child relationship under section 7(b) of the Parentage Act, because that section specifically provides the child may bring such a motion. See *In re M.M.*, 401 Ill. App. 3d 416, 422-23 (2010). However, it was the State's Attorney, not the GAL, who filed the motion in this case.

-7-

this case." (Emphasis in original.) *G.E.M.*, 382 Ill. App. 3d at 1117.

In this case, as in *G.E.M.*, whether the presumed father signed the VAP due to fraud, duress, or material mistake of fact is a claim relating to the legal interest of the father, and should be advanced by the father himself. The State, who is not a signatory to the VAP, cannot make this argument on the father's behalf.

¶ 21 We reject the State's argument that because the challenge to Alfred's paternity occurred during a proceeding under the Juvenile Court Act of 1987 (705 ILCS 405/1-1 *et seq.* (West 2010)), it had standing to challenge Alfred's paternity. The provisions of the Parentage Act govern issues relating to paternity (see 750 ILCS 45/9(a) (West 2010)), and that statute does not give the State standing to challenge Alfred's paternity in the manner it did.

¶ 22 In addition, even if it did have standing to challenge Alfred's VAP on the basis of a material mistake of fact, we do not believe that the State met its burden. The Parentage Act does not define what is required to prove a material mistake of fact in a challenge to a VAP, but under the common law, to rescind a contract based on a mistake of fact a party must show a mistake as to "a material feature of the contract, that the mistake is of such grave consequence that to enforce the contract would be unconscionable, that the mistake occurred notwithstanding the exercise of due care on the part of the party seeking rescission, and that the other party can be placed *in statu quo*." *Keller v. State Farm Insurance Co.*, 180 Ill. App. 3d 539, 548 (1989). Something is "material" if the party seeking rescission would have acted differently had he been aware of the fact, or if it concerned the type of information upon which he would be expected to rely when making his decision to act. *Jordan v. Knafel*, 378 Ill. App. 3d 219, 229 (2007). It is unclear whether the genetic identity of N.C. is material as to Alfred, because even after discovering he was not the biological father he still has sought to uphold the validity of the VAP and remain the legal father of N.C. Also, even if the genetic identity of N.C. is material, there is nothing to suggest Alfred should not bear the risk of such a mistake, since by signing the VAP a man gives up his right to a genetic test to determine fatherhood. Accordingly, we do not believe the DNA test results conclusively establish a material mistake of fact under the circumstances of this case. Likewise, the State did not establish Alfred executed the VAP due to fraud.

¶ 23 Based on the foregoing, it was error for the trial court to grant the motion for declaration of nonpaternity and dismiss Alfred as a party to the neglect proceedings. Alfred, as the presumed father, had the right to be heard and present evidence at the neglect hearing. Under the Juvenile Court Act, the parent of a minor has "the right to be present, to be heard, to present evidence material to the proceedings, to cross-examine witnesses, to examine pertinent court files and records, and *** the right to be represented by counsel." 705 ILCS 405/1-5(1) (West 2010). The statute grants these rights to a parent in a neglect proceeding to protect a parent's due process rights. See *In re K.C.*, 323 Ill. App. 3d 839, 849 (2001). We conclude that because Alfred was dismissed from the neglect hearing and the allegations of neglect concerned his conduct, the trial court's finding that N.C. was neglected due to an injurious environment must be reversed and the matter remanded for a new hearing on the neglect petition, at which Alfred has the right to be heard and present evidence. Because the focus of a neglect proceeding is on whether the child is neglected, and not whether a parent is neglectful (see *In re Arthur H.*, 212 Ill. 2d 441, 467 (2004)), this also necessitates reversing

the adverse finding against respondent as well. Assuming Alfred's status as the legal father remains unchanged, both respondent and Alfred should have the opportunity to present evidence as to whether N.C. is neglected. Therefore, we reverse and remand the matter to the trial court.

¶ 24                                    CONCLUSION

¶ 25     For the foregoing reasons, we reverse the judgment of the circuit court of Peoria County and remand the matter for further proceedings consistent with this opinion.

¶ 26     Reversed and remanded with directions.

¶ 27     JUSTICE CARTER, dissenting.

¶ 28     I respectfully dissent from the majority's opinion in the present case. I would affirm the trial court's judgment and would hold that the trial court did not err in: (1) finding that N.C. was a neglected minor; or (2) granting the State's motion to declare nonpaternity as to Alfred. Because the majority does not address the first issue in its ruling, I will not address that issue in further detail in this dissent.

¶ 29     In resolving the second issue, contrary to the majority's opinion, I believe that we must consider not only the provisions of the Parentage Act, but also the provisions of the Juvenile Court Act because the State's challenge to the VAP was made in the context of a juvenile neglect proceeding. In fact, one of the State's main assertions on this issue is that it had standing to seek a declaration of nonpaternity under the Juvenile Court Act because it became the real party in interest once the juvenile neglect petition was filed. See *In re J.J.*, 142 Ill. 2d 1, 6 (1991).

¶ 30     The main purpose of the Juvenile Court Act is to ensure the best interests of the minor and the community, and, if possible, to preserve and strengthen the minor's family ties. 705 ILCS 405/1-2(1) (West 2010); *In re D.S.*, 198 Ill. 2d 309, 319 (2001). To give effect to that purpose, the Juvenile Court Act is to be liberally construed. 705 ILCS 405/1-2(4) (West 2010). A juvenile abuse, neglect, or dependency proceeding is not a true adversarial proceeding but, rather, is one undertaken in the best interests of the minor. See *In re J.J.*, 142 Ill. 2d 1, 8-9 (1991). Under the Juvenile Court Act, when an abuse, neglect, or dependency petition is filed, both the State and the trial court have a duty to protect the minor's best interests. *J.J.*, 142 Ill. 2d at 8; *D.S.*, 198 Ill. 2d at 324. Unlike in other court proceedings, in a proceeding under the Juvenile Court Act, the trial court may take a more active role and may even direct the course of the proceedings as necessary to promptly ascertain the jurisdictional facts and to fully gather information bearing upon the minor's current condition and future welfare. 705 ILCS 405/1-2(2) (West 2010); *D.S.*, 198 Ill. 2d at 324.

¶ 31     In the present case, when I consider the relevant provisions of the Parentage Act (as set forth in the majority's opinion) in light of the context of the instant action (a juvenile neglect proceeding) and the relevant provisions of the Juvenile Court Act, I would find that the State

had standing to file a motion for a declaration of nonpaternity as to Alfred. I would reach that conclusion for several reasons. First, the actions taken by the State in this case were authorized by both the Juvenile Court Act and the Parentage Act. The juvenile neglect action in the instant case was brought in the best interests of the minor, N.C. See 705 ILCS 405/1-2(1), 2-13(1) (West 2010); *J.J.*, 142 Ill. 2d at 8-9. During the course of those proceedings, the State and the trial court were obligated to act in N.C.'s best interests. See *D.S.*, 198 Ill. 2d at 324. In my opinion, that obligation could include the filing of a motion for a declaration of nonpaternity if, under the particular facts of the case at hand, the State or the trial court, on its own motion, believed that the best interests of the minor required that a determination of paternity be made. See *In re A.K.*, 250 Ill. App. 3d 981, 984-85 (1993) (the trial court properly determined the parentage of a minor in a juvenile abuse case under the Juvenile Court Act, even though a presumption of paternity existed as to the presumed father because of the presumed father's marriage to the minor's mother and despite the fact that the minor's mother was precluded from raising the issue due to a prior ruling in a dissolution proceeding). In fact, the Juvenile Court Act specifically provides for the filing of motions as necessary to protect the best interests of the minor. 705 ILCS 405/2-13(6) (West 2010). Moreover, it is clear that under the Parentage Act, the GAL in this case could have filed a motion for declaration of nonpaternity on the minor's behalf. See 750 ILCS 45/7(b) (West 2010); *M.M.*, 401 Ill. App. 3d at 422-23. It is also clear and undisputed that the GAL in this case did, in fact, agree with the State that the best interests of N.C. would not be served by allowing the VAP to stand. Thus, under the unique facts of the present case, the State was authorized and, perhaps, obligated under the Juvenile Court Act and the Parentage Act to file the motion for declaration of nonpaternity.

¶ 32 Second, there is nothing in the Parentage Act that specifically precludes the State from filing a motion to declare nonpaternity under the facts of the present case. Section 6(d) of the Parentage Act, which addresses the manner in which a VAP may be challenged, does not contain any limitation on who may file such a challenge (see 750 ILCS 45/6(d) (West 2010)), and such a limitation may not be read into the statute by this court on appeal. See *Gaffney*, 2012 IL 110012, ¶ 56. In addition, to the extent that section 7(b) of the Parentage Act can be read as a limitation on who may challenge a VAP, that limitation did not prevent the State from doing so in the present case, since the juvenile neglect petition was brought in the minor's best interests and since the minor herself would have had the ability to challenge the VAP under section 7(b). See 750 ILCS 45/7(b) (West 2010). Indeed, it would seem to be implied in the spirit and purpose of both the Parentage Act and the Juvenile Court Act to allow for the filing of such a motion under the facts of the present case to protect the best interests of the minor and to provide for the minor's support. See *In re S.B.*, 2012 IL 112204, ¶ 28 (although a court should be cautious about reading words into a statute, it will not hesitate to read into a statute a qualifying or expanding expression plainly implied by the general context of the act, which has been palpably omitted and which is necessary to prevent the legislative purpose from failing in one of its material aspects).

¶ 33 Finally, to the extent that the Parentage Act would require the challenging party, under the facts of the present case, to establish a material mistake of fact, I believe that such a showing was made. The DNA evidence conclusively established that a mistake of fact had

been made about whether Alfred was the natural father of N.C. Although a presumed father in Alfred's position may not present DNA evidence to establish a mistake of fact (see *People ex rel. Department of Public Aid v. Smith*, 212 Ill. 2d 389, 405-06 (2004)), I see no reason why such a limitation would apply to the State challenging a VAP in the context of a juvenile neglect proceeding under the facts of the present case.

¶ 34     For the reasons stated, I respectfully dissent from the majority's opinion in the present case. As noted above, I would affirm the trial court's judgment.