# Illinois Official Reports

## Supreme Court

---

*In re N.C.*, 2014 IL 116532

---

| | |
|---|---|
| Caption in Supreme Court: | *In re* N.C., a Minor (The People of the State of Illinois, Appellant, v. Nichole G., Appellee, and the Department of Healthcare and Family Services, Intervenor-Appellee). |
| Docket No. | 116532 |
| Filed | June 19, 2014 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | The State has standing to raise parentage issues in a child neglect proceeding, but there must be compliance with the Parentage Act; and where a man who married the mother after the birth signed a voluntary acknowledgement of paternity, but DNA evidence subsequently excluded his fatherhood, the State was not among those statutorily entitled to initiate a paternity challenge (although the guardian *ad litem* was), and its motion to dismiss the man as a party should not have been granted. |
| Decision Under Review | Appeal from the Appellate Court for the Third District; heard in that court on appeal from the Circuit Court of Peoria County, the Hon. Mark E. Gilles, Judge, presiding. |
| Judgment | Affirmed. |

| Counsel on Appeal | Lisa Madigan, Attorney General, of Springfield, and Jerry Brady, State's Attorney, of Peoria (Jane Elinor Notz, Deputy Solicitor General, and Timothy M. Maggio, Assistant Attorney General, of Chicago, and Patrick Delfino, Terry A. Mertel and Mark A. Austill, of the Office of the State's Attorneys Appellate Prosecutor, of Ottawa, of counsel), for the People. |
| | |
| | Louis P. Milot, of Peoria, for appellee. |
| | |
| | Lisa Madigan, Attorney General, of Springfield (Carolyn E. Shapiro, Solicitor General, and Diane M. Potts, Deputy Attorney General, of Chicago, of counsel), for intervenor-appellee. |
| | |
| | Robert F. Harris, Cook County Public Guardian, of Chicago (Kass A. Plain and Christopher Williams, of counsel), *amicus curiae*. |
| | |
| | Bruce A. Boyer, of Chicago, for *amicus curiae Civitas* ChildLaw Clinic. |
| | |
| | Chlece Neal, Miriam Hallbauer and Richard T. Cozzola, of Chicago, for *amicus curiae* LAF. |

| Justices | JUSTICE KILBRIDE delivered the judgment of the court, with opinion.
Justices Freeman, Thomas, Karmeier, and Burke concurred in the judgment and opinion.
Justice Theis specially concurred, with opinion, joined by Chief Justice Garman. |

**OPINION**

¶ 1    This appeal asks whether the State has standing in a juvenile neglect proceeding (705 ILCS 405/1-1 *et seq.* (West 2012)) to challenge the paternity of a man, Alfred C., who signed a voluntary acknowledgement of paternity under the Illinois Parentage Act of 1984 (Parentage Act) (750 ILCS 45/1 *et seq.* (West 2012)). Four days after the birth of the minor, N.C., the State filed a juvenile neglect petition seeking to have N.C. adjudicated neglected and made a

ward of the court. On the State's motion, the circuit court of Peoria County dismissed Alfred from the neglect proceedings, based on DNA evidence establishing that he was not N.C.'s biological father.

¶ 2      Following adjudicatory and dispositional hearings, the circuit court found that N.C. was neglected and the respondent mother, Nichole G., was unfit, made N.C. a ward of the court, and named the Department of Children and Family Services as N.C.'s guardian. A majority of the appellate court reversed, concluding that the State did not have standing to challenge Alfred's paternity in the neglect proceedings and, even if it had standing, the State did not comply with the applicable statutory provisions. The appellate court remanded the matter to the circuit court for new neglect proceedings that would include Alfred. For the reasons that follow, we affirm the appellate court's judgment, and remand with directions.

¶ 3                                 I. BACKGROUND

¶ 4      Respondent, Nichole G., gave birth to N.C. on February 17, 2012, at Proctor Hospital in Peoria, Illinois. Nichole was not married at the time. The following day, February 18, 2012, Nichole and her boyfriend, Alfred C., executed a voluntary acknowledgement of paternity of N.C., referred to by the parties and the lower courts in this case as a VAP.

¶ 5      The VAP advised Alfred that it constituted a legal document that operated "the same as a court order determining the legal relationship between a father and child." The VAP expressly imposed a legal responsibility on Alfred to provide financial support for N.C. until the age of 18 years, including child support and medical support. The VAP did not grant Alfred a right to custody or visitation, but it did provide him the right to seek custody or visitation from the court. Alfred was also entitled to all notices of adoption proceedings. Both Nichole and Alfred had the right to rescind the VAP by signing a "Rescission of VAP" form within 60 days of the earlier of the acknowledgement's execution or a proceeding relating to the child. The VAP also explicitly waived Alfred's right to genetic testing.

¶ 6      On February 21, 2012, four days after Nichole gave birth to N.C. and three days after Nichole and Alfred executed the VAP, the Department of Children and Family Services (DCFS) took N.C. into protective custody. On February 22, 2012, DCFS filed a petition in the circuit court of Peoria County alleging juvenile neglect under section 2-13 of the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/2-13 (West 2012)). The petition identified Nichole as N.C.'s mother and Alfred as N.C.'s father. The petition contained separate allegations against Nichole and Alfred to support the charges.

¶ 7      Specifically, the petition alleged that Nichole: (1) had been adjudicated an unfit parent in previous proceedings for her other three children; (2) had not subsequently been found to be a fit parent; (3) had two paramours who committed physical acts of violence against Nichole or her children; and (4) had a criminal history of retail theft in 2010. The petition alleged that Alfred (1) was bipolar and was not taking his medication; (2) had anger management issues; (3) was homeless after being "kicked out" of his sister's house; and (4) had an extensive criminal history. Alfred's criminal history included resisting police officers in 2011; harassing a witness, unlawful restraint, and resisting arrest in 2006; threatening a public official in 2004; aggravated battery and possession of an explosive or incendiary device in 2000; battery,

criminal damage to property, and disorderly conduct in 1998; battery and resisting a police officer in 1994; battery in 1991; and reckless conduct in 1984.

¶ 8        On February 23, 2012, the circuit court entered an order for temporary shelter care, placed N.C. in the custody of DCFS, and appointed a guardian *ad litem* (GAL) to represent N.C.'s interests. The court also entered an order identifying Alfred as the "legal" father based on the VAP and appointed separate counsel for Nichole and Alfred.

¶ 9        On February 28, 2012, Nichole and Alfred filed answers to the State's neglect petition. Both stipulated that the State would call witnesses at the adjudicatory hearing who would support all of the allegations against Alfred.

¶ 10       Also on February 28, 2012, the State made an oral request for genetic testing on Alfred "due to the VAP." None of the parties objected to this motion. The court granted the State's request and ordered the parties to cooperate. The court also ordered DCFS to schedule and pay for the testing.

¶ 11       On March 6, 2012, Nichole and Alfred got married. The next day, March 7, 2012, Nichole and Alfred participated in a DCFS integrated assessment interview conducted by two caseworkers from Family Core. Based on the interview statements made by Nichole and Alfred, the caseworkers created a report summarizing the background of N.C.'s case and the personal history of Alfred and Nichole.

¶ 12       In pertinent part, the report noted that Alfred signed the VAP stating he was N.C.'s father, but the report claimed that Nichole "questioned paternity." Alfred and Nichole gave slightly conflicting accounts of their relationship, but both stated that they initially met at the Peoria bus station in either 2009 or 2010. They dated briefly, until Alfred moved to southern Illinois.

¶ 13       Alfred told the screeners that he returned to Peoria in December 2011, when he and Nichole started dating again. Nichole, however, told screeners that Alfred returned to Peoria in May 2011, and they resumed their relationship. Nichole stated that she first had sexual relations with Alfred in May 2011. Nichole further explained that she also "dated" another man, Joseph R., from May 2011 until December 2011.

¶ 14       Alfred told the screeners that he was "very confident" that N.C. was his child. Nichole, however, told the screeners that she "tried" to explain to Alfred that he is likely not N.C.'s father. Nichole suggested that N.C.'s biological father was her former boyfriend, Joseph R. Nichole explained that she was dating Joseph R. when she became pregnant with N.C.

¶ 15       In the final section of Alfred's interview, the screeners concluded that it is "highly likely" that Alfred was not N.C.'s biological father. The screeners further concluded that Alfred's "active, untreated mental health symptoms, combined with his lifestyle, significant criminal history, and suspected domestic violence are also concerns when considering any role he may play in providing care to [N.C.], either as her determined father or as [Nichole's] husband."

¶ 16       On March 16, 2012, LabCorp, a genetic testing company, took samples from Alfred and N.C. for DNA analysis consistent with the trial court's prior order for genetic testing. On April 1, 2012, LabCorp issued a report concluding that Alfred was not the biological father of N.C., calculating the probability of Alfred's paternity at 0.00%.

¶ 17       On April 3, 2012, the State filed a "Motion for Declaration of Non-Paternity," citing LabCorp's report finding that Alfred was not N.C.'s biological father. The State sought a declaration that Alfred "is not the legal father of [N.C.]," and asked that Alfred "be removed as

a party" from the neglect proceeding. The State did not cite any specific statutory provision in its motion. Neither Alfred nor Nichole filed an objection to the State's motion.

¶ 18    At a hearing on April 30, 2012, the trial court heard arguments on both the State's motion for declaration of nonpaternity and the State's petition alleging juvenile neglect. The State, the GAL, and separate counsel for Alfred and Nichole appeared at the hearing.

¶ 19    The court first considered the State's motion for declaration of nonpaternity. The parties stipulated that Nichole and Alfred had executed a VAP. Over Nichole's objection, the State presented the unsworn testimony of the Family Core caseworker, who stated that Nichole told her that she and Alfred's relationship began in December 2011. According to the caseworker, Alfred initially claimed the relationship started in December 2011. When Alfred was reminded that N.C. was born in February 2012, he stated that he and Nichole were intimate in either May or June of 2011.

¶ 20    During arguments, the State conceded that it could not bring an action for nonexistence of a parent and child relationship under section 7 of the Parentage Act (750 ILCS 45/7(b) (West 2012)). The State contended, however, that it was entitled to challenge the VAP under section 6(d) of the Parentage Act (750 ILCS 45/6(d) (West 2012)), authorizing challenges to a VAP based on fraud, duress, or material mistake of fact. The State argued that the evidence that Alfred and Nichole's relationship did not begin until December 2011, with N.C.'s birth in February 2012, constituted either a material mistake of fact or fraud on the issue of Alfred's paternity. Thus, the State asked the court to vacate the VAP.

¶ 21    The GAL agreed with the State that sufficient grounds existed to "set side or nullify" the VAP under section 6(d) of the Parentage Act based on fraud or material mistake of fact. The GAL explained that upholding the VAP in this case would "undermine its purpose to establish a legal relationship between a biological father and his child." In support, the GAL noted that the VAP expressly stated that its purpose was to establish a legal relationship between a biological father and his child when the parents are not married. The GAL further argued that a VAP "is not a proper way to establish a relationship between a non-biological father and a child." Instead, the GAL argued that type of relationship should be established through adoption. Alternatively, the GAL argued that the matter could be resolved by "a motion or a petition for nonpaternity brought by a proper party."

¶ 22    Counsel for Alfred argued that the valid VAP legally established Alfred as N.C.'s father and that the State had not met its burden to invalidate the VAP based on fraud, material mistake of fact, or duress. Counsel noted that both Alfred and Nichole claimed to have had sexual relations in June 2011, making it possible for him to be the biological father of N.C.

¶ 23    Citing *People ex rel. Department of Public Aid v. Smith*, 212 Ill. 2d 389 (2004), and *In re Parentage of G.E.M.*, 382 Ill. App. 3d 1102 (2008), Nichole's counsel argued that challenging a VAP is difficult. Specifically, counsel argued that a VAP could not be challenged by "a simple motion," that the State did not have standing to challenge the VAP, and that the State did not present sufficient evidence to invalidate the VAP in this case.

¶ 24    Following arguments, the court granted the State's motion for declaration of Alfred's nonpaternity, finding that it was in N.C.'s best interests. The court explained that: (1) the State's motion was filed shortly after N.C.'s birth; (2) unopposed genetic testing established that Alfred was not N.C.'s biological father; and (3) it would be bad public policy to allow

someone who is not the child's biological father to sign a VAP to establish himself as the father when he is not the child's actual father. The court then discharged Alfred as a party to the neglect proceedings, and granted the State's motion to amend the neglect petition to reflect that Alfred was no longer the legal father of N.C.[1]

¶ 25    After discharging Alfred, the trial court proceeded to an adjudicatory hearing on the neglect petition. At the start of the hearing, the court granted the State's request to question Nichole about the possible biological father of N.C. Nichole identified Joseph R. as the only potential father of N.C. Nichole stated that Joseph R. lived in Peoria, but she did not know his address.

¶ 26    Following additional brief testimony from Nichole on the neglect petition, the court determined that the State had proven all of the allegations. Therefore, the court found that N.C.'s environment was injurious to her health and, thus, she was a neglected minor.

¶ 27    On April 30, 2012, the circuit court entered an order finding Joseph R. to be the putative father of N.C. The sheriff of Peoria County personally served Joseph R. with a juvenile court summons to appear on May 21, 2012, on the allegations of N.C. being a neglected minor. A Family Core caseworker sent Joseph R. a letter at the homeless shelter he frequented, advising him that he may be the father of a child born in February 2012. The letter asked Joseph R. to contact the caseworker immediately and also offered Joseph R. assistance in establishing paternity. It is not apparent from the record whether Joseph R. received that letter. Ultimately, though, Joseph R. did not contact the caseworker and did not appear at the dispositional hearing.

¶ 28    On May 21, 2012, following a hearing, the circuit court entered a dispositional order making N.C. a ward of the court and naming the Guardianship Administrator of DCFS as N.C.'s guardian. On May 25, 2012, Nichole filed a notice of appeal.

¶ 29    On appeal, a majority of the appellate court reversed. The majority held that Nichole had standing to appeal the finding of nonpaternity against Alfred and his discharge from the case because they were married. The majority further found, however, that the State did not have standing to challenge Alfred's paternity in the neglect proceedings. 2013 IL App (3d) 120438, ¶¶ 13, 20.

¶ 30    Alternatively, the majority held that even if the State had standing to challenge Alfred's paternity and the VAP under section 6(d), the State failed to prove the requisite material mistake of fact. The majority reasoned that "[i]t is unclear whether the genetic identity of N.C. is material as to Alfred, because even after discovering he was not the biological father he still has sought to uphold the validity of the VAP and remain the legal father of N.C." The majority also concluded that the State was not a party authorized under section 7(b) to bring an action to disestablish Alfred as N.C.'s father. 2013 IL App (3d) 120438, ¶¶ 14, 22.

¶ 31    Ultimately, the majority concluded that the trial court committed reversible error when it granted the State's motion for declaration of nonpaternity and dismissed Alfred from the neglect proceedings. The majority determined that, "[a]ssuming Alfred's status as the legal

---

[1]The circuit court granted Alfred's request to certify the order for appeal, and Alfred filed a petition for leave to appeal pursuant to Supreme Court Rule 306(a)(5) (eff. Feb. 16, 2011). The appellate court denied Alfred's petition on May 25, 2012. Alfred is not a party to this appeal.

father remains unchanged, both respondent and Alfred should have the opportunity to present evidence as to whether N.C. is neglected." Because Alfred was a necessary party in the neglect proceedings, the majority reversed the trial court's finding of neglect against Nichole and remanded for a new hearing on the neglect petition. 2013 IL App (3d) 120438, ¶ 23.

¶ 32    Justice Carter dissented, arguing that the State had standing to file the motion for nonpaternity because the State was obligated to act in N.C.'s best interests under the Juvenile Court Act, and the evidence demonstrated that it was in N.C.'s best interests to make a determination of paternity. Justice Carter noted that the GAL supported the State's position that N.C.'s best interests would not be served by allowing the VAP to stand. Moreover, the GAL could have filed its own motion for declaration of nonpaternity on N.C.'s behalf under the Parentage Act (750 ILCS 45/7(b) (West 2012)). Thus, Justice Carter concluded that "under the unique facts of the present case, the State was authorized and, perhaps, obligated under the Juvenile Court Act and the Parentage Act to file the motion for declaration of nonpaternity." 2013 IL App (3d) 120438, ¶ 31 (Carter, J., dissenting).

¶ 33    Justice Carter also argued that nothing in the Parentage Act expressly prohibited the State from challenging a VAP, nor did the Act prohibit the State from filing a motion to declare nonpaternity under the circumstances of N.C.'s case. Finally, to the extent that the Parentage Act requires a party challenging a VAP to show a material mistake of fact, the DNA evidence here conclusively established that Alfred was mistaken on the issue of whether he was N.C.'s biological father. 2013 IL App (3d) 120438, ¶¶ 32, 33 (Carter, J., dissenting).

¶ 34    This court allowed the State's petition for leave to appeal (Ill. S. Ct. R. 315(a) (eff. July 1, 2013)) and allowed the Department of Healthcare and Family Services to intervene as an appellee.[2] We also allowed the Cook County public guardian, the *Civitas* ChildLaw Clinic and LAF to file *amicus curiae* briefs (Ill. S. Ct. R. 345 (eff. Sept. 20, 2010)).

¶ 35                                          II. ANALYSIS

¶ 36    On appeal, the State argues that it has standing to ensure that N.C.'s biological father was participating in the neglect proceedings under its general responsibility to protect neglected minors, and under four specific statutory provisions in the Juvenile Court Act and Parentage Act. Because the State is obligated to care for neglected minors, such as N.C., under the *parens patriae* doctrine (*In re D.S.*, 198 Ill. 2d 309, 328 (2001)), the State contends that it has the requisite "cognizable interest" necessary to confer standing in this case.

¶ 37    More specifically, the State argues that its actions to identify N.C.'s biological father in the neglect proceedings were permitted under four statutory provisions: (1) section 2-13(6) of the Juvenile Court Act, authorizing the State to file "one or more motions in the best interests of the minor" while neglect proceedings are pending in the circuit court (705 ILCS 405/2-13(6) (West 2012)); (2) section 6(d) of the Parentage Act, authorizing challenges to a VAP based on fraud, duress, or material mistake of fact (750 ILCS 45/6(d) (West 2012)); (3) section 7(a) of the Parentage Act, authorizing a child, mother, pregnant woman, any person or public agency

---

[2]To clarify the parties involved in this appeal, we note that the intervening appellee, Department of Healthcare and Family Services (the Department), is distinct from the Department of Children and Family Services (DCFS).

who has custody or provides support to the child, and the presumed or alleged father to bring an action to determine the existence of the father and child relationship (750 ILCS 45/7(a) (West 2012)); or (4) section 7(b) of the Parentage Act, authorizing a child, natural mother, or presumed father to declare the nonexistence of a parent and child relationship (750 ILCS 45/7(b) (West 2012)). For parts of its argument, the State emphasizes that N.C.'s GAL supported its motion to disestablish Alfred's paternity and remove him from the neglect proceedings.

¶ 38    Nichole responds that actions to disestablish paternity are not specifically authorized under the Juvenile Court Act and the doctrine of *parens patriae* is inapplicable here because the State is effectively seeking to make N.C. an illegitimate child. Nichole contends that "it is entirely too speculative (and premature) to presume that N.C. is better off as an illegitimate child and that the child's illegitimacy needs to be protected or advanced by the State's Attorney." Nichole asserts that it was improper, and not in N.C.'s best interests, for the State to seek to disestablish Alfred's paternity without first establishing paternity in another putative father. Nichole notes that one of the stated purposes of the Juvenile Court Act is to preserve family ties whenever possible, and the State's actions here directly contradict that purpose.

¶ 39    To the extent that the Parentage Act permits N.C.'s GAL to file motions to disestablish paternity, Nichole argues the GAL did not file a motion in this case. Nichole urges this court to reject the State's contention that it has "vicarious standing" to file the disestablishment motion based on the GAL's support of that motion. Under the Juvenile Court Act, the GAL is solely responsible for filling motions on the minor's behalf. Even assuming the State had standing to disestablish paternity here, Nichole argues that the DNA evidence establishing that Alfred is not N.C.'s biological father is insufficient to defeat the VAP because it does not constitute a material mistake of fact, fraud, or duress.

¶ 40    The Department, as the intervening appellee, responds that the Parentage Act governs parentage issues in proceedings under the Juvenile Court Act, and the State failed to comply with the Parentage Act's provisions when it sought to resolve the parentage issues raised in this case. The Department argues that a VAP is conclusive on the issue of parentage and verification through genetic testing is not permitted under the Parentage Act or this court's decision in *People ex rel. Department of Public Aid v. Smith*, 212 Ill. 2d 389 (2004). The Department further argues that if the State wanted to file a petition to establish N.C.'s biological father under section 7(a) of the Parentage Act, it should have named Joseph R. as the alleged father and, if genetic testing established him as N.C.'s biological father, the trial court could have resolved the paternity issue accordingly. The Department also contends that the State did not have standing to disestablish Alfred's parentage under section 7(b) of the Parentage Act because that provision strictly restricts standing to mothers, children, and fathers presumed by marriage.

¶ 41                    A. Standing Under the Juvenile Court Act to Address Paternity Issues

¶ 42    As demonstrated by the parties' arguments, we must initially decide whether the State has standing to address paternity issues in proceedings under the Juvenile Court Act. Standing is a common law concept, satisfied if a "party has a real interest in the outcome of the controversy." *People v. $1,124,905 U.S. Currency & One 1988 Chevrolet Astro Van*, 177 Ill.

2d 314, 328 (1997). We review *de novo* the issues of whether a party has standing and the proper construction of the Juvenile Court Act because they both present questions of law. *Powell v. Dean Foods Co.*, 2012 IL 111714, ¶ 35; *Ries v. City of Chicago*, 242 Ill. 2d 205, 216 (2011). When construing statutory provisions, our goal is to determine and effectuate the legislature's intent, best indicated by giving the statutory language its plain and ordinary meaning. *Innovative Modular Solutions v. Hazel Crest School District 152.5*, 2012 IL 112052, ¶ 22.

¶ 43    The neglect proceedings in this case were initiated under the Juvenile Court Act. The Juvenile Court Act's express purpose is to secure for every minor subject to its provisions "the safety and moral, emotional, mental, and physical welfare of the minor and the best interests of the community," and "to preserve and strengthen the minor's family ties whenever possible." 705 ILCS 405/1-2(1) (West 2012). The Juvenile Court Act also instructs that its provisions must be liberally construed to accomplish its purpose. 705 ILCS 405/1-2(4) (West 2012).

¶ 44    As this court has recognized, the State's *parens patriae* power to protect minors is codified in the Juvenile Court Act because it "specifically charges the circuit court with the duty to act in the best interests of the minor and for the minor's own protection." *In re D.S.*, 198 Ill. 2d 309, 328 (2001). Moreover, when a petition is filed under the Juvenile Court Act alleging that a child is abused, neglected, or dependent, the State becomes the real party in interest and is solely responsible for prosecuting the petition. *In re J.J.*, 142 Ill. 2d 1, 6 (1991); *In re D.S.*, 198 Ill. 2d at 322.

¶ 45    Relevant to the initial standing issue presented here, section 6-9 of the Juvenile Court Act provides that "[i]f parentage is at issue in any proceeding under this Act *** the Illinois Parentage Act of 1984 shall apply and the court shall enter orders consistent with that Act." 705 ILCS 405/6-9(1) (West 2012). Applying the plain meaning of this provision, section 6-9(1) contemplates the State raising, and the circuit court resolving, parentage issues in a neglect proceeding under the Juvenile Court Act. Implicitly, then, section 6-9(1) *authorizes* the State to raise parentage issues in a neglect proceeding under the Juvenile Court Act in a manner consistent with the Parentage Act.

¶ 46    Moreover, section 2-13(6) of the Juvenile Court Act provides that "[a]t any time before dismissal of the petition or before final closing and discharge *** one or more motions in the best interests of the minor may be filed." 705 ILCS 405/2-13(6) (West 2012). A motion under section 2-13(6) must include sufficient facts in support of the relief requested. 705 ILCS 405/2-13(6) (West 2012). This unlimited provision broadly authorizes the State to file *any* type of motion if it is in the best interests of the minor. Necessarily, this would include a motion to address a paternity issue in the best interests of the minor if sufficient facts in support were included in the motion.

¶ 47    Thus, recognizing the Juvenile Court Act's purpose and the State's unique enforcement role and liberally construing the plain meaning of sections 6-9(1) and 2-13(6) to accomplish the Juvenile Court Act's goals (705 ILCS 405/1-2(4) (West 2012)), we conclude that the State has standing to raise parentage issues in a neglect proceeding in the best interests of a minor. Although the State is authorized to raise a parentage issue in a neglect proceeding under the Juvenile Court Act, it is equally clear that the State's action must comply with the Parentage Act. 705 ILCS 405/6-9(1) (West 2012). Accordingly, we next consider whether the State's

challenge to Alfred's paternity in the underlying neglect proceedings complied with the Parentage Act.

¶ 48                              B. The Parentage Act

¶ 49     The State asserts that its challenge to Alfred's paternity complied with the Parentage Act in three separate and alternative ways. Specifically, the State relies on the following actions authorized by the Parentage Act: (1) an action to invalidate a VAP under section 6(d) (750 ILCS 45/6(d) (West 2012)); (2) an action to establish a father and child relationship under section 7(a) (750 ILCS 45/7(a) (West 2012)); or (3) an action to declare the nonexistence of the parent and child relationship under section 7(b) (750 ILCS 45/7(b) (West 2012)). See *supra* ¶ 37.

¶ 50     The State's argument requires us to construe the Parentage Act, presenting a question of law that we review *de novo. Innovative Modular Solutions v. Hazel Crest School District 152.5*, 2012 IL 112052, ¶ 22. The fundamental goal of statutory construction is to ascertain and give effect to the legislature's intent, best indicated by giving the statutory language its plain and ordinary meaning. *Innovative Modular Solutions*, 2012 IL 112052, ¶ 22. This court will enforce clear and unambiguous statutory language as it is written, and we will not read into it exceptions, conditions, or limitations not expressed by the legislature. *Ryan v. Board of Trustees of the General Assembly Retirement System*, 236 Ill. 2d 315, 319 (2010).

¶ 51     The Parentage Act creates a statutory mechanism for legally establishing a parent-child relationship. *J.S.A. v. M.H.*, 224 Ill. 2d 182, 198 (2007). The Parentage Act serves Illinois's public policy by expressly recognizing the right of every child to the physical, mental, emotional and monetary support of his or her parents. 750 ILCS 45/1.1 (West 2012). Under the Parentage Act, a father and child relationship can be established a number of ways. 750 ILCS 45/4 (West 2012). The Parentage Act also contains a number of presumptions of paternity based on the marital status of the parents or the signing of a VAP. 750 ILCS 45/5 (West 2012).

¶ 52     Relevant here, under section 6 of the Parentage Act, is that a parent and child relationship can be established by consent with the valid execution of a VAP between the biological mother and a man claiming to be the child's father. 750 ILCS 45/6(a) (West 2012). Paternity established by a VAP "has the full force and effect of a judgment entered under this Act and serves as a basis for seeking a child support order without any further proceedings to establish paternity." 750 ILCS 45/6(b) (West 2012). In fact, a judicial or administrative proceeding to "ratify" paternity established under section 6 is "neither required nor permitted." 750 ILCS 45/6(c) (West 2012). The presumption of paternity created by a VAP is conclusive unless the VAP is rescinded by the father or mother within the earlier of 60 days or the date of an administrative or judicial proceeding involving one of the signatories and relating to the child. 750 ILCS 45/5(b)(1), (b)(2) (West 2012); 410 ILCS 535/12(6), (7) (West 2012). Here, it is undisputed that Nichole and Alfred signed a VAP. Thus, under sections 5 and 6 of the Parentage Act, Alfred is conclusively presumed to be N.C.'s legal father. The State contends, however, that it properly challenged Alfred's presumed paternity under section 6(d) and two separate subsections of section 7. We address each of the State's arguments in turn.

## 1. Section 6(d) of the Parentage Act

Section 6(d) details the only permissible way to challenge a VAP under the Parentage Act, and provides, in its entirety:

> "(d) A signed acknowledgement of paternity entered under this Act may be challenged in court only on the basis of fraud, duress, or material mistake of fact, with the burden of proof upon the challenging party. Pending outcome of the challenge to the acknowledgement of paternity, the legal responsibilities of the signatories shall remain in full force and effect, except upon order of the court upon a showing of good cause." 750 ILCS 45/6(d) (West 2012).

This language demonstrates that the legislature intended any challenge under section 6(d) to be limited in nature, identifying only three possible grounds for a challenge—fraud, duress, or material mistake of fact. Indeed, these narrow grounds are similar to the equitable grounds used by parties to a contract to rescind the contract and restore the parties to their initial status. See, *e.g.*, *Freedberg v. Ohio National Insurance Co.*, 2012 IL App (1st) 110938, ¶ 27 (recognizing that a contract may be rescinded based on fraud or misrepresentation); *Corcoran v. Northeast Illinois Regional Commuter R.R. Corp.*, 345 Ill. App. 3d 449, 454 (2003) (discussing requirements to rescind a contract based on a mutual mistake of a material fact); *Osage Corp. v. Simon*, 245 Ill. App. 3d 836, 843 (1993) (voiding a contract that was a product of duress). Section 6(d) also plainly instructs that the legal responsibilities of *the signatories* remain in full force pending any challenge to the VAP. The section, however, provides no basis for the State, who did not sign the VAP, to employ the contractual-based grounds in section 6(d) to defeat the VAP. Therefore, considered in its entirety, the language of section 6(d) suggests that the legislature intended to permit the signatories to use section 6(d) but did not intend to permit the State to challenge a VAP under section 6(d).

Construing section 6(d) of the Parentage Act narrowly is consistent with this court's holding in *People ex rel. Department of Public Aid v. Smith*, 212 Ill. 2d 389 (2004), that section 6(d) provided a tightly limited means to defeat a VAP. In *Smith*, we held that a man who signs a VAP is not permitted to later challenge the VAP under section 6(d) with DNA evidence showing that he is not the child's biological father. *Smith*, 212 Ill. 2d at 391. We also recognized, as we do here, that section 6(d) explicitly limits VAP challenges only to claims of fraud, duress, or material mistake of fact. *Smith*, 212 Ill. 2d at 399.

Explaining the limited options to challenge a VAP, we observed that section 6(d) was enacted to bring Illinois in compliance with federal regulations pertaining to the Social Security Act and block grants for the Temporary Assistance for Needy Families program (TANF). Among other requirements, TANF mandates that a state operate a child support enforcement program that includes a simple process for voluntary acknowledgements of paternity with a 60-day rescission option, and limits challenges to a VAP only on the basis of fraud, duress, or material mistake of fact. *Smith*, 212 Ill. 2d at 402-03.

We also noted in *Smith* that a presumption of paternity created by a VAP is conclusive under the Parentage Act, unlike the rebuttable paternity presumptions created by marriage. *Smith*, 212 Ill. 2d at 404-05. In other words, the legislature intended a challenge to the

- 11 -

presumption of paternity created by a VAP to be more limited and difficult. Thus, we concluded that "[u]nder the limited circumstances presented in section 6(d), a man who voluntarily acknowledges paternity can later challenge the *voluntariness* of the acknowledgement if he can show that it was procured by fraud, duress, or material mistake of fact, but the Parentage Act does not allow him to challenge the conclusive presumption of paternity with contrary evidence." (Emphasis in original.) *Smith*, 212 Ill. 2d at 405.

¶ 58        Although we did not consider whether the State could bring a VAP challenge under section 6(d) in *Smith*, its rationale is consistent with our construction of section 6(d) in this case. Our recognition in *Smith* of the limited nature of a section 6(d) challenge brought by a man who agreed to be legally bound by a VAP comports with our conclusion here that the legislature intended section 6(d) to be used by the VAP signatories because they, unlike the State, are legally obligated to provide financial support to the child under the VAP. It is also consistent with *Smith*'s recognition that Illinois adopted a VAP system specifically to comply with federal regulations seeking to facilitate the enforcement of child support orders. Certainly, the enforcement of child support orders based on a VAP could potentially be hindered if the State is permitted in a juvenile neglect proceeding to use section 6(d) to invalidate a VAP with DNA evidence, as the State attempted here. See *People v. Latona*, 184 Ill. 2d 260, 269 (1998) (noting that this court has a duty to avoid construing a statute in a way that defeats the purpose of the statute); see also 750 ILCS 45/6(c) (West 2012) (prohibiting DNA evidence from being used to "ratify" a validly executed VAP).

¶ 59        Accordingly, the State cannot challenge Alfred's paternity under section 6(d). Thus, we need not consider whether the State complied with section 6(d) here, or whether its evidence was sufficient to establish a material mistake of fact or fraud. While the State is not permitted to challenge Alfred's paternity under section 6(d), that does not necessarily mean that a man presumed to be a father under a VAP is forever shielded from a paternity contest. To the contrary, as explained below, the Parentage Act permits an action to establish or disestablish a father and child relationship, regardless of any presumption of paternity, in section 7. See also *In re Paternity of an Unknown Minor*, 2011 IL App (1st) 102445, ¶ 10 (VAP does not preclude paternity action by biological father under section 7(a) of the Parentage Act); *In re M.M.*, 401 Ill. App. 3d 416, 422-23 (2010) (VAP does not preclude paternity action by the minor child under section 7(b) of the Parentage Act).

¶ 60                              2. Section 7 of the Parentage Act

¶ 61        Next, we consider whether the State's challenge to Alfred's paternity complied with section 7 of the Parentage Act. Generally, section 7 of the Parentage Act details the procedures for bringing an action to determine the existence of a father and child relationship (establish) or declare the nonexistence of a father and child relationship (disestablish), and it identifies who can initiate those actions. 750 ILCS 45/7 (West 2012). Relevant to the issue raised here, the Parentage Act also authorizes the trial court to order genetic testing to establish or disestablish the father and child relationship in *any* type of section 7 action. 750 ILCS 45/11(a) (West 2012). If the trial court finds that the genetic testing shows the alleged father is not the biological parent of the child, "the question of paternity shall be resolved accordingly." 750 ILCS 45/11(f)(1) (West 2012). Alternatively, if the testing shows the alleged father is the

biological parent of the child, "the alleged father is presumed to be the father, and this evidence shall be admitted." 750 ILCS 45/11(f)(3) (West 2012).

¶ 62 The State argues that its challenge to Alfred's paternity was proper as either an establishment action under subsection (a) or a disestablishment action under subsection (b) of section 7 of the Parentage Act. The State also emphasizes that N.C.'s GAL supported its challenge to Alfred's paternity.

¶ 63 We first consider subsection (a) of section 7, providing a mechanism to establish a father and child relationship. Subsection (a) broadly authorizes a variety of individuals to file an action to determine the existence of the father and child relationship, *regardless* of whether the relationship is already presumed under section 5 of the Act. 750 ILCS 45/7(a) (West 2012). The expansive group permitted to bring an action under subsection (a) includes: (1) the child; (2) the mother; (3) a pregnant woman; (4) any person or public agency who has custody of, or is providing or has provided financial support to the child; (5) the Department if it is providing or has provided financial support or is assisting with child support collection services; or (6) a man presumed or alleging himself to be the father of the child or expected child. 750 ILCS 45/7(a) (West 2012). The only requirement for bringing a subsection (a) action is that "[t]he complaint shall be verified and shall name the person or persons alleged to be the father of the child." 750 ILCS 45/7(a) (West 2012).

¶ 64 Initially, we note that the appellate court did not consider whether the State's challenge was proper as an establishment action under section 7(a). The reason for this is clear. Alfred is presumed to be N.C.'s legal father as a result of the VAP. In the circuit court, the State solely sought to remove Alfred from the proceedings and did not identify another man as N.C.'s alleged father, as would be required under section 7(a). Instead, the State's contest to Alfred's paternity indisputably was in the form of a disestablishment action, the subject of section 7(b). In other words, this appeal does not involve an establishment action under section 7(a). Accordingly, because the State's challenge here cannot be construed as an establishment action under section 7(a), we need not consider in this case whether the State is authorized to bring an establishment action under that provision, or otherwise complied with section 7(a).

¶ 65 Thus, we next consider whether the State's challenge to Alfred's paternity was proper as a disestablishment action under subsection (b) of section 7. Subsection (b) provides a much more narrow type of action and explicitly limits its application to actions brought by the child, the natural mother, or a man presumed to be the father for reasons related to marriage. 750 ILCS 45/7(b) (West 2012). An action under subsection (b) must also be brought by verified complaint. 750 ILCS 45/7(b) (West 2012).

¶ 66 Here, the State is not a party statutorily authorized to bring a disestablishment action under subsection (b), and the action was not brought by verified complaint. We reject the State's assertion that it obtained standing to bring a disestablishment action under subsection (b) based on the GAL's support of the State's attempt to remove Alfred from the neglect proceedings. Although we agree with the State that N.C.'s GAL, acting on N.C.'s behalf, could have brought the disestablishment action under subsection (b), we emphasize that in this case it was the State and *not* the GAL that filed the motion. See *In re D.S.*, 198 Ill. 2d 309, 321 (2001) (GAL is responsible for filing pleadings on behalf of a minor in juvenile court proceedings); see also *In re M.M.*, 401 Ill. App. 3d 416, 421-24 (2010) (affirming GAL's ability to file a

- 13 -

petition to disestablish an acknowledged father in a juvenile neglect proceeding). The Act, however, narrowly authorizes a disestablishment action under subsection (b) to be filed by the child, the mother, or a man presumed to be the father by reason of marriage. 750 ILCS 45/7(b) (West 2012).

¶ 67 We also agree with the State that if the GAL files an action to disestablish a father under subsection (b) of section 7 in a juvenile neglect proceeding, the State assumes the responsibility for prosecuting the action in that proceeding. See *In re D.S.*, 198 Ill. 2d at 322 (explaining that in proceedings under the Juvenile Court Act the State is responsible for prosecuting the action). That does not mean, however, that the State obtains standing to *initiate* a subsection (b) disestablishment action vicariously through the GAL. To the contrary, the Parentage Act does not authorize the State to initiate a subsection (b) disestablishment action. See 705 ILCS 405/6-9(1) (West 2012) (Parentage Act applies to "any" proceeding under the Juvenile Court Act when a parentage issue is involved); see also *Ryan v. Board of Trustees of the General Assembly Retirement System*, 236 Ill. 2d 315, 319 (2010) (this court must enforce unambiguous statutory language as it is written). Therefore, we conclude that the State is not permitted to initiate a disestablishment action under subsection (b) of section 7 of the Parentage Act.

¶ 68 Because the State's challenge to Alfred's paternity in this case did not comply with the Parentage Act, we remand, as the appellate court did, for a new neglect proceeding. We note, however, that by remanding for a new neglect proceeding, we do not mean that proceedings to disestablish Alfred's paternity are foreclosed. In the proceedings below, N.C.'s GAL supported the State's attempt to disestablish Alfred as N.C.'s father. Because the GAL has standing to file a disestablishment action under section 7(b) of the Parentage Act (750 ILCS 45/7(b) West 2012)), the GAL may initiate such a proceeding on remand. Depending on the results of any paternity proceedings properly held in accord with the Parentage Act, a new neglect proceeding may or may not be necessary.

¶ 69                                    III. CONCLUSION
¶ 70 In summary, we hold that although a party's paternity may be challenged in a neglect proceeding under the Juvenile Court Act, the challenge must comply with the provisions of the Parentage Act. Here, the State's challenge to Alfred's paternity failed to comply with the Parentage Act.

¶ 71 Accordingly, we affirm the appellate court's judgment. We remand with directions for the trial court to conduct a new hearing on the neglect petition that includes Alfred and Nichole. If, however, on remand, N.C.'s GAL decides to renew the challenge to Alfred's paternity, the challenge must comply with the Parentage Act. The results of any such proceedings will determine whether a new neglect proceeding must be held.

¶ 72 Affirmed.
¶ 73 Cause remanded with directions.

¶ 74 JUSTICE THEIS, specially concurring:

¶ 75     The majority initially states that under the Juvenile Court Act "the State has standing to raise parentage issues in a neglect proceeding in the best interests of a minor," as long as the State's action complies with the Parentage Act. *Supra* ¶ 47. The majority then holds that the State cannot comply with the Parentage Act because it has no standing to challenge paternity under sections 6(d) or 7(b) of the Parentage Act. *Supra* ¶¶ 59, 70. Although I agree with the ultimate holding, it is irreconcilable with the initial premise. I write separately because I disagree that the State's Attorney has standing under the Juvenile Court Act to challenge paternity in a neglect proceeding. Rather, I would hold that the Parentage Act governs issues related to parentage arising in any civil proceeding and that statute does not authorize the State's Attorney to challenge a VAP or to pursue an action to disestablish paternity.

¶ 76     The majority observes that section 6-9 of the Juvenile Court Act contemplates that parentage issues may arise in a neglect proceeding. 705 ILCS 405/6-9 (West 2012). It then recognizes that the State has the authority in a neglect proceeding to file motions in the best interest of a child under section 2-13(6) of the Juvenile Court Act (705 ILCS 405/2-13(6) (West 2012)). From these observations, it concludes that the State's Attorney has standing to file a motion in a neglect proceeding to raise paternity issues in the best interest of the child under the Juvenile Court Act, as long as there are sufficient facts to support it. Nowhere in its opinion does the majority explain what relief the State's Attorney could seek in that motion, or what dispositional order the circuit court could enter based on that motion. The answer would be none.

¶ 77     Indeed, the plain language of both the Parentage Act and the Juvenile Court Act explicitly provide that parentage issues in juvenile court proceedings are governed by the Parentage Act. See 750 ILCS 45/9(a) (West 2012) ("In *any* civil action not brought under this Act, the provisions of this Act shall apply if parentage is at issue." (Emphasis added.)); 705 ILCS 405/6-9(1) (West 2012) ("If parentage is at issue in any proceeding under this Act *** then the [Parentage Act] shall apply and the court shall enter orders consistent with that Act."). Thus, the General Assembly has specifically articulated that any issues involving paternity, whether they arise under the Parentage Act or *any other* civil proceeding, must consistently adhere to the statutory directives of the Parentage Act.

¶ 78     The majority's determination that the State's Attorney has standing to challenge paternity under the best interest provisions of the Juvenile Court Act is inconsistent with the statutory directives of the Parentage Act, and misconstrues the State's Attorney's limited role under the Parentage Act. The Parentage Act expressly identifies the purpose of the statute is to further the "right of every child to the physical, mental, emotional and monetary support of his or her parents under this Act." 750 ILCS 45/1.1 (West 2012). With that in mind, the statute sets forth a comprehensive scheme for legally establishing a parent and child relationship and for challenging an established parent and child relationship. It specifically identifies those parties who may initiate these types of challenges and the particular procedures which they must follow. See generally 750 ILCS 45/7 (West 2012).

¶ 79     The General Assembly made a deliberate choice not to include the State's Attorney as one of the parties authorized to bring a disestablishment action against a man conclusively established as the presumed father by a VAP. 750 ILCS 45/7(b) (West 2012). The VAP represents a conscious decision by an individual to accept the legal responsibility of being the

child's father. This acknowledgment serves an important role in keeping with the overriding purpose of the statute. The State must give full force and effect to that acknowledgment in the same manner as a judgment of parentage. 750 ILCS 45/6(b) (West 2012). In keeping with the stated purpose, the statute limits those that can seek to disestablish paternity to the mother, child, and a man presumed to be the father for reasons related to marriage. 750 ILCS 45/7(b) (West 2012). In this way, the General Assembly has recognized and balanced the varied interests at stake, including the interests of the child.

¶ 80    Although the State's Attorney argues its standing to challenge parentage derives from its responsibility under the Juvenile Court Act to act in the best interest of the child, the Parentage Act does not expressly provide for the court to consider the best interests of the child prior to declaring the nonexistence of a parent and child relationship. Similarly, in cases brought by proper parties to establish paternity under section 7(a), this court has previously explained that there is no express requirement that a court first consider the best interests of the child before a legal determination of paternity can be made. *In re Parentage of John M.*, 212 Ill. 2d 253, 264 (2004). It is only after parentage is established that the court is then charged with the responsibility under section 14 with addressing parental rights such as custody or visitation which shall not be granted unless it is in the best interests of the child. *Id.* at 264-65.

¶ 81    To be sure, issues may arise as to whether a father who signed a VAP is abusing or neglecting a child. The State's Attorney always has the duty and responsibility to prosecute these issues in the best interest of the child (*In re J.J.*, 142 Ill. 2d 1, 12 (1991)), as it originally set out to do in this case by filing a juvenile neglect petition and seeking to have N.C. adjudicated neglected and made a ward of the court. Nevertheless, merely because a paternity issue may arise in the context of a neglect proceeding under the Juvenile Court Act does not provide the State's Attorney with standing to challenge the paternity of a legal father and is inconsistent with the legislative directive of the Parentage Act. Whether paternity issues arise in a neglect proceeding, a dissolution proceeding, an adoption proceeding or independently, does not alter the command of the Parentage Act. It would be contrary to the express legislative directive and public policy for different rules to apply regarding parentage issues arising in juvenile court proceedings as opposed to parentage issues arising in other civil proceedings. The State's Attorney's standing, if any, to challenge paternity in this context or in any other civil proceeding must derive from the Parentage Act. Indeed, as the majority explains, under the Parentage Act, the State's Attorney is not authorized to challenge a VAP or to bring a disestablishment action.

¶ 82    Additionally, I reject the majority's characterization of the State's Attorney's role under the Parentage Act. The majority holds that if a GAL initiates a disestablishment action during the pendency of a neglect proceeding on behalf of the child, that the State must prosecute that action. *Supra* ¶ 68. The majority relies solely on *In re D.S.*, 198 Ill. 2d 309 (2001), a termination of parental rights case, for support. In *D.S.*, this court held the power to prosecute a termination of parental rights petition under the Juvenile Court Act belongs solely to the State. *Id.* at 322. Significantly, *D.S.* expressly relied upon the lack of any private right to prosecute petitions filed pursuant to the Juvenile Court Act, which is purely a prosecutorial function traditionally reserved to the State. *Id.*

¶ 83     In contrast, the Parentage Act expressly contains a provision affording a child a private right to pursue an action to disestablish parentage. The statute expressly provides that the GAL may represent the child in that action. 750 ILCS 45/7(c) (West 2012). In terms of counsel, the Act specifically limits the role of the State's Attorney. Section 18(b) provides that "*[u]pon the request* of a mother or child seeking to *establish* the existence of a father and child relationship, the State's Attorney shall represent the mother or child in the trial court." (Emphases added.) 750 ILCS 45/18(b) (West 2012). That section further provides that "[l]egal representation by the State's Attorney *** shall be limited to the establishment and enforcement of an order for support, and shall not extend to visitation, custody, property or other matters." *Id*. Thus, the statute plainly limits the role of the State's Attorney to involvement *only* if the mother or child requests it, and *only* with respect to establishment of paternity and enforcement of child support orders. Accordingly, the majority's holding, that the State's Attorney must prosecute a disestablishment action brought by a child or his GAL during the pendency of a neglect proceeding, is contrary to the plain language of the statute. Consequently, I cannot join in that part of the majority's opinion.

¶ 84     In conclusion, under the Juvenile Court Act, the State has broad powers to protect the welfare of children and several tools at its disposal to accomplish that objective. For example, the Act empowers the State's Attorney to remove a minor from her legal parents if neglect is suspected (705 ILCS 405/2-5 (West 2012)), place the child in temporary custody (705 ILCS 405/2-10 (West 2012)), require parents to comply with court orders and service plans to ensure the child's safety (705 ILCS 405/2-23 (West 2012)), and to terminate parental rights upon proof of unfitness if in the best interest of the child (705 ILCS 405/2-27, 2-28 (West 2012)). In contrast, under the Parentage Act, the General Assembly has chosen to limit the role of the State's Attorney with respect to issues related to paternity. That limited role does not include challenging a VAP or disestablishing the paternity of a man who has been conclusively presumed to be the legal father.

¶ 85     CHIEF JUSTICE GARMAN joins in this special concurrence.