NOTICE
Decision filed 12/04/25. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2025 IL App (5th) 250559-U

NOS. 5-25-0559, 5-25-0578 cons.

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

---

| | | |
|---|---|---|
| *In re* EMANUEL N. II and ZAHIR N., Minors | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Marion County. |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | |
| v. | ) | Nos. 23-JA-63, 24-JA-89 |
| | ) | |
| Emanuel N., | ) | Honorable |
| | ) | Ericka A. Sanders, |
| Respondent-Appellant). | ) | Judge, presiding. |

---

JUSTICE VAUGHAN delivered the judgment of the court.
Justices Boie and McHaney concurred in the judgment.

**ORDER**

¶ 1    *Held*:    The trial court's finding of unfitness on the basis of depravity was not against the manifest weight of the evidence. The respondent father lacked standing to challenge the court's decision not to appoint his sister as the guardian of his youngest son.

¶ 2    The respondent, Emanuel N., appeals the trial court's order terminating his parental rights to his son, Emanuel N. II,[1] arguing that the finding of unfitness was against the manifest weight of the evidence. Specifically, he asserts that he has overcome the presumption of depravity arising from his prior felony convictions. The respondent also appeals the trial court's dispositional order

---

[1]The record contains pleadings and other documents referring to the child alternatively as Emanuel N. Jr., Emanuel N. II, or simply Emanuel N. However, the name appearing on his birth certificate is Emanuel N. II. Because the father and son have the same name, we will refer to the father as "the respondent" and to the child as "Emanuel" or "Emanuel II," to avoid confusion.

1

making his younger son, Zahir N., a ward of the court. He argues that the court abused its discretion by placing custody and guardianship of Zahir with the Department of Children and Family Services (DCFS) instead of with the respondent's sister. We affirm both orders.

¶ 3                                    I. BACKGROUND

¶ 4     Both Emanuel II and Zahir are the biological sons of the respondent and Nikkita C., who is not a party to this appeal. Emanuel was taken into care in August 2023 as a newborn baby. Zahir was born in October 2024, while the juvenile case involving Emanuel was still pending. He, too, was taken into care as a newborn baby. Both children were placed in foster care with Lanette and Stacy Heselton, who are the adoptive parents of two of Nikkita's older children.

¶ 5                          A. The Proceedings Involving Emanuel II

¶ 6     On August 29, 2023, the State filed a petition for adjudication of wardship alleging that Emanuel (born August 22, 2023) was neglected due to an environment injurious to his welfare (705 ILCS 405/2-3(1)(b) (West 2022)) in that (1) his mother's parental rights were terminated in previous proceedings because she did not engage in or complete services;[2] and (2) his mother gave birth to him while incarcerated and planned to leave him in the care of the putative father,[3] who had a history of violence. Along with the petition, the State filed a motion for temporary custody containing the same allegations. The trial court entered a temporary custody order after a shelter care hearing that day.

¶ 7     The trial court held an adjudicatory hearing on October 25, 2023. Both parents stipulated to the allegation of neglect based on the termination of Nikkita's parental rights in prior

---

[2]The petition alleged that Nikkita's parental rights were terminated in three separate juvenile cases involving her three older children. However, the dispositional report subsequently filed with the court indicates that although her parental rights to her oldest daughter were terminated, Nikkita relinquished her parental rights to her second and third children. The State acknowledged this mistake in the proceedings involving Zahir.

[3]DNA testing later confirmed that the respondent is Emanuel's biological father.

proceedings. The court entered a written order adjudicating Emanuel a neglected minor on November 13, 2023.

¶ 8    After a continuance, the matter came for a dispositional hearing on January 17, 2024. Nikkita, who was released from prison at the end of November 2023, failed to appear. The trial court found both parents unfit and determined that being placed in the custody and guardianship of DCFS was in Emanuel's best interests. The same day, the court entered a dispositional order making Emanuel a ward of the court and setting a permanency goal of return home within 12 months.

¶ 9    A status report filed with the court on April 2, 2024, indicated that the respondent was arrested for domestic battery in Coles County on March 7, 2024. In the attached police report, the victim's name was redacted. However, the report noted that the victim alleged that she was beaten by her "significant other," with whom she had a child in common. At an April 3, 2024, status hearing, the guardian *ad litem* (GAL) and Emanuel's caseworker informed the court of the respondent's arrest, noting that it was "very clear" Nikkita was the victim of the domestic battery.[4]

¶ 10    On July 3, 2024, the trial court changed the permanency goal from return home within 12 months to substitute care pending termination of parental rights. The court noted in a docket entry that it found this goal appropriate where neither parent had engaged in services or made any progress, Nikkita had been physically assaulted by the respondent, and Nikkita was recently arrested. The court entered a written permanency order to that effect on August 7, 2024.

---

[4]The court asked the caseworker to call the police department to confirm the identity of the victim, and she indicated that she would do so. Informal discovery notices filed with the court indicate that the State obtained copies of the police report and the charging instrument charging the respondent with domestic battery in connection with the incident in Coles County case No. 24-CF-99 and provided copies to the GAL and the attorneys for both parents. Additional informal discovery notices indicate that the State also obtained copies of a police report and charging instrument in Marion County case No. 24-CF-212, involving a charge of aggravated battery/pregnancy, and provided copies to the other attorneys. However, those documents do not appear in the record.

¶ 11    On August 7, 2024, the State filed a petition to terminate parental rights alleging that both parents were unfit on the following four grounds: (1) they were presumed to be depraved because each had been convicted of at least three felonies, at least one of which was within five years before the petition was filed (750 ILCS 50/1(D)(i) (West 2024)); (2) they abandoned the child (*id.* § 1(D)(a)); (3) they failed to maintain a reasonable degree of interest, concern, or responsibility as to the child's welfare (*id.* § 1(D)(b)); and (4) they deserted the child for more than three months after the proceedings were initiated (*id.* § 1(D)(c)). With respect to the allegations of depravity, the petition specified that the respondent was convicted of five felonies, four of which were committed within the last five years, and that Nikkita was convicted of three felonies, two of which were committed within the last five years.

¶ 12    The matter proceeded to an unfitness hearing on October 30, 2024. The State offered into evidence certified copies of the respondent's convictions in Fayette County case No. 19-CF-104, Coles County case No. 19-CF-241, Clinton County case No. 20-CF-127, and Marion County cases 23-CF-390 and 16-CF-278. The court admitted the copies.

¶ 13    Chelsea Toohey, a foster care manager at Hoyleton Youth and Family Services (Hoyleton), testified for the State that she was involved in the case as either the supervisor or primary caseworker since the case was opened. She explained that she was originally the supervisor, but she took over as the primary caseworker in June 2024, when Emanuel's original caseworker went on leave.

¶ 14    Toohey testified that her first contact with the respondent was in September 2023 when she spoke to him on the phone to schedule DNA testing and discuss his integrated assessment. After that initial conversation, contact with him was "inconsistent." She testified that the respondent contacted her by phone and email in May 2024. He asked if he could see Emanuel, but he did not

ask how the child was doing. That was Toohey's last contact with the respondent. She further testified that the respondent never gave Emanuel any gifts or provided financial support.

¶ 15    Toohey stated that the last visit between the respondent and Emanuel took place in January 2024. She explained that the agency attempted to set up a visitation schedule between January and May of 2024. However, each time a visit was scheduled, the respondent had a conflict that "would come up within a couple of days." She noted that rescheduling those visits was difficult due to difficulties in communicating with the respondent. Toohey testified that in May 2024, the agency discontinued visits "due to hostility and aggression." Asked to elaborate, Toohey noted that during phone conversations, the respondent often raised his voice, used profane language, and refused to allow others to respond.

¶ 16    The respondent's mother, Judith Meeks-Hakim, testified on his behalf. Asked if she noticed any changes in her son over the last year "regarding his mental health," Meeks-Hakim noted that the respondent was in counseling with two different therapists. She stated, "If he's grown doing his sessions, he comes and discusses them with me openly." She noted that this was something he did not always do. Asked to describe changes she noticed in his behavior, Meeks-Hakim replied, "He's not so emotional." She later clarified, "I couldn't say he's not that emotional, but—at one point it was like hindering him, but it's not anymore, you know." She noted that he frequently told her he was trying to do what the judge told him to do.

¶ 17    Meeks-Hakim acknowledged that the respondent had a criminal history. She stated, however, that he was trying to change. She described the respondent as "very dependable" and "very caring."

¶ 18    The fitness portion of the hearing continued on December 4, 2024, at which time the parties presented closing arguments. The court took the matter under advisement.

¶ 19    On January 29, 2025, the trial court entered a written order finding both parents unfit and setting forth its rationale. The court noted that the only viable claim of unfitness against the respondent was the allegation that he was depraved. The court explained that there was a rebuttable presumption of depravity based on the evidence that the respondent was convicted of five felonies, all within five[5] years of the filing of the termination petition. The court noted that the State presented additional evidence of depravity, highlighting testimony that his communication with caseworkers "was inconsistent, hostile, and aggressive," and evidence that he engaged in violence against Nikkita.

¶ 20    The court recognized that the respondent offered testimony to rebut the presumption of depravity—specifically, Meeks-Hakim's testimony that the respondent's behavior had changed and he was less emotional. However, the court stated, "The Court can glean from the testimony offered in rebuttal that [the respondent] may have achieved some ability to control his emotions. But, given the testimony of Ms. Toohey, change was minimal and not to an extent that would allow [the respondent] to overcome the presumption." The court thus found the respondent unfit based on the allegation that he was depraved. However, the court found that the State failed to prove the remaining allegations of unfitness against him by clear and convincing evidence. The court found Nikkita unfit on all four grounds alleged.

¶ 21    The best-interest hearing took place on March 19, 2025. Emanuel's foster mother, Lanette Heselton, testified that she brought Emanuel home from the hospital on August 30, 2023, eight days after he was born. She and her husband, Stacy, have a four-bedroom house. They previously adopted two of Emanuel's older siblings, Anna and Matthew. In addition, "baby Zahir" lives with

_____

[5]The trial court's order mistakenly states the five felony convictions were all within five years of the filing of the termination petition; however, only four convictions were within the five-year period. The respondent was convicted in Marion County case No. 16-CF-278 on January 30, 2018, which was approximately 6½ years from the filing of the termination petition.

them, and they have custody of a 17-year-old niece. Heselton testified that Emanuel interacts well with everyone in the household. He also has a close relationship with his oldest biological sister, Kia. Although Kia does not live in the same household, Heselton stated that they often spend time with her. Both foster parents love Emanuel and want to adopt him.

¶ 22 Heselton also testified about Emanuel's medical needs. She stated, "So, with Emanuel, as you probably remember, he did have the heart condition."[6] She testified that he has appointments at Children's Hospital every six months, during which he sees multiple specialists. She explained that some of the care was deemed necessary because some children with Emanuel's heart condition "tend to fall behind developmentally" and "they just want to make sure he stays on track." Heselton testified that she would continue to ensure that Emanuel got to his medical appointments.

¶ 23 Hoyleton foster care manager Toohey testified that she had no concerns about the Heseltons' home. She likewise had no concern about either of them if they adopted Emanuel.

¶ 24 The respondent's sister, Nahseekah Johnson, testified on his behalf. She stated that she would be able to provide the respondent with any help or support he needed in raising Emanuel. She further testified that the respondent was then living with his mother, whose home would be safe for Emanuel.

¶ 25 The GAL recommended that both parents' rights be terminated. She emphasized that Emanuel was placed with his siblings, which is a DCFS priority. She further emphasized that the Heseltons were providing Emanuel with everything he needed, including making sure his medical needs were met. The court took the matter under advisement.

---

[6]Emanuel underwent heart surgery in November 2023, as originally noted in the dispositional report filed with the court in January 2024. Heselton did not specifically refer to the surgery in her testimony.

¶ 26    On April 23, 2025, the trial court entered an order setting forth its findings with respect to Emanuel's best interest. The court found that (1) the foster parents met all of Emanuel's needs, including "his significant medical needs"; (2) Emanuel had "familial ties with his biological half-siblings," who lived with him; (3) he had lived in his foster home since birth and was integrated into their family; and (4) the foster parents loved Emanuel and wanted to adopt him. The court thus found that it was in Emanuel's best interest to terminate both parents' parental rights.

¶ 27    On May 7, 2025, the trial court entered an order terminating both parents' parental rights to Emanuel. On June 6, 2025, the respondent filed a motion to reconsider, arguing that the court abused its discretion both in finding him unfit and in finding that terminating his rights was in Emanuel's best interest. He did not elaborate on either argument.

¶ 28    On June 25, 2025, the trial court denied the motion to reconsider, stating in a docket entry, "Motion is denied for reasons appearing on the record." Although the record does not contain a transcript, the docket entry indicates that a motion hearing was held that day. The respondent filed a timely appeal of the termination order on July 15, 2025.

¶ 29                              B. The Proceedings Involving Zahir

¶ 30    Zahir was born on October 18, 2024. Three days later, the State filed a petition for adjudication of wardship alleging that Zahir was a neglected minor due to an environment injurious to his welfare (705 ILCS 405/2-3(1)(b) (West 2024)) in that (1) his mother's other children were previously wards of the court, her parental rights were terminated, and she did not engage in or complete services ordered; (2) his sibling was currently a ward of the court and the conditions leading to the child's removal had not been fully corrected; and (3) his mother tested positive for amphetamines and methamphetamine upon admission to the hospital to give birth to him. The petition further alleged that Zahir was neglected in that he was a newborn baby whose blood, urine,

8

or meconium contained any amount of a controlled substance (*id.* § 2-3(1)(c)). Along with the petition, the State filed a motion for temporary custody, which was granted after a shelter care hearing that day.

¶ 31 The trial court held an adjudicatory hearing on January 15, 2025. The court entered an adjudicatory order finding Zahir to be a neglected minor on January 27, 2025.

¶ 32 On March 21, 2025, Hoyleton filed a dispositional report with the court. The report included a summary of the integrated assessments conducted in September 2023, shortly after Emanuel came into care, and December 2024, after Zahir came into care. The assessor noted that the respondent "appear[ed] to have a chronic history of domestic violence in romantic relationships," admitted to an incident in which he strangled Nikkita, continued to have contact with Nikkita despite a no-contact order, and failed to engage in services or visitation in Emanuel's case. The report indicated that Zahir was placed in a foster home with three of his biological siblings and had been in the same placement since birth.

¶ 33 The dispositional hearing took place on March 26, 2025. The State asked the court to take judicial notice of the dispositional report and argued that both parents were unfit, emphasizing the respondent's criminal history and the fact that Zahir was born substance exposed.

¶ 34 The respondent called his sister, Nahseekah Johnson, as a witness. She testified that she met her nephew, Zahir, at the hospital shortly after he was born, but she had not had the opportunity to see him since that time.

¶ 35 Johnson explained that she intended to bring Zahir home from the hospital to live with her, something that she and the respondent and their mother had planned for "several months." She made sure her home had diapers, clothes, formula, a bed, a changing table, and everything a baby would need for the first year of life. Johnson further explained that several months before the

9

baby's birth, his mother, Nikkita, asked Johnson to take care of him. Johnson stated, "She was wanting to basically give her rights to me." Nikkita wrote a "formal document" to that effect and had it notarized. A signed notice was identified and entered into evidence. It said, "I am signing my parental rights for the baby to his blood relative aunt, Nahseekah Johnson." It was signed by both Nikkita and Johnson, notarized, and dated September 10, 2024. Johnson acknowledged that the respondent did not sign the document, noting that she did not believe he was aware of it at the time. She further acknowledged that she did not seek to set up a guardianship through the courts.

¶ 36 Johnson testified that she worked as a certified nursing assistant caring for hospice patients and assisted living residents. She further testified that she had three children of her own, ranging in age from 21 to 13. She stated that, if awarded custody of Zahir, she would abide by all court orders and DCFS rules, even if that meant keeping Zahir away from the respondent. She was prepared to bring him home that day.

¶ 37 On April 23, 2025, the trial court entered a written order setting forth its factual findings. The court first found both parents unfit. The court then noted that Johnson was willing and able to care for Zahir and stated that she was "an accomplished person who is a professional and also a single parent to three children of her own." The court noted that Zahir was placed in a foster home with three of his siblings and found that he was thriving in that home and that his foster parents indicated that they were willing to facilitate a relationship between Zahir and the respondent's family.

¶ 38 In determining whether to make Zahir a ward of the court or place him in Johnson's custody, the court stated that changing his placement would limit, if not eliminate, his contact with his siblings. In addition, the court explained that Zahir would lose DCFS resources available to him as a ward of the court and that not making him a ward of the court would remove any

10

possibility of reunification with his parents. The court therefore concluded that it was in Zahir's best interest to be made a ward of the court with custody and guardianship to DCFS.

¶ 39    On May 7, 2025, the court entered a dispositional order reiterating these findings and making Zahir a ward of the court. On June 6, 2025, the respondent filed a motion to reconsider that ruling, arguing that it was against the manifest weight of the evidence. In a June 25, 2025, docket entry, the court stated, "Motion is denied for reasons appearing on the record." As in Emanuel's case, the docket entry indicates a motion hearing was held that day, but the record does not include a transcript of that hearing.

¶ 40    The respondent filed a timely appeal from the dispositional order on July 18, 2025. On July 22, 2025, this court entered an order consolidating the respondent's separate appeals in both of these cases.

¶ 41                            II. ANALYSIS

¶ 42                    A. The Termination Order in Emanuel's Case

¶ 43    The respondent argues that the trial court's finding of unfitness is against the manifest weight of the evidence. More specifically, he contends that he rebutted the statutory presumption of depravity and that the evidence did not support the court's finding to the contrary. We disagree.

¶ 44    Involuntary termination of parental rights involves a two-step process. First, the State must prove the respondent parent unfit by clear and convincing evidence. *In re Baby Boy*, 2025 IL App (4th) 241427, ¶ 62. If the trial court finds the parent unfit, the proceedings progress to the second step, at which the State must prove by a preponderance of the evidence that termination of parental rights is in the best interest of the child. *Id.* ¶ 73.

¶ 45    Here, the trial court found that the respondent was unfit because he was depraved. 750 ILCS 50/1(D)(i) (West 2024). The Illinois Supreme Court has defined depravity as " 'an inherent

11

deficiency of moral sense and rectitude.' " *In re J.A.*, 316 Ill. App. 3d 553, 561 (2000) (quoting *Stalder v. Stone*, 412 Ill. 488, 498 (1952)). Depravity consists of conduct of sufficient duration and repetition to demonstrate a moral deficiency or an inability or unwillingness to conform to accepted moral norms. *Id.* (citing *In re Adoption of Kleba*, 37 Ill. App. 3d 163, 166 (1976)).

¶ 46    We afford great deference to the trial court's findings because that court had the opportunity to observe and evaluate the parties and hear their testimony. *In re Daphnie E.*, 368 Ill. App. 3d 1052, 1064 (2006). In cases involving allegations of unfitness based on depravity, there is an additional reason to defer to the trial court's findings because that ground "requires the trier of fact to closely scrutinize the character and credibility of the parent." *In re J.A.*, 316 Ill. App. 3d at 563. We will not reverse a finding of unfitness unless it is against the manifest weight of the evidence. *In re Baby Boy*, 2025 IL App (4th) 241427, ¶ 63. A decision is against the manifest weight of the evidence "if the opposite conclusion is apparent or when findings appear to be unreasonable, arbitrary, or not based on the evidence presented." *In re Za. G.*, 2023 IL App (5th) 220793, ¶ 31.

¶ 47    Section 1(D)(i) of the Adoption Act creates a rebuttable presumption of depravity if the respondent parent has been convicted of at least three felonies, at least one of which was entered within five years of the date on which the petition to terminate was filed. 750 ILCS 50/1(D)(i) (West 2024). Here, the State presented certified copies of five felony convictions, four of which occurred within five years of the filing of the petition to terminate. Thus, there is no question that the statutory presumption arose. At issue is whether the respondent rebutted that presumption and, if so, whether the State nevertheless proved him unfit due to depravity by clear and convincing evidence.

12

¶ 48    A rebuttable presumption effectively creates a *prima facie* showing as to a particular issue in a case. *In re J.A.*, 316 Ill. App. 3d at 562. As such, its practical effect is to require the opposing party to present evidence to rebut the presumption. *Id.* The statutory presumption of depravity may be rebutted through evidence tending to show that a parent has been rehabilitated or is able to parent a child safely. See, *e.g.*, *In re A.M.*, 358 Ill. App. 3d 247, 254 (2005); *In re Shanna W.*, 343 Ill. App. 3d 1155, 1167 (2003); *In re J.A.*, 316 Ill. App. 3d at 563; *In re M.G.*, 2022 IL App (5th) 210366-U, ¶ 22.[7] There is no precise rule as to the amount of evidence necessary to rebut the presumption. *In re J.A.*, 316 Ill. App. 3d at 563. However, it is important to emphasize that a parent in termination proceedings is not required to rebut the presumption of depravity by clear and convincing evidence. *In re P.J.*, 2018 IL App (3d) 170539, ¶ 14. In addition, if the respondent parent successfully rebuts the presumption, thereby terminating the presumption, the State may still be able to satisfy its burden of proving the parent unfit due to depravity by clear and convincing evidence. *In re A.M.*, 358 Ill. App. 3d at 253-54.

¶ 49    In this case, the respondent offered the testimony of his mother, Judith Meeks-Hakim, to rebut the presumption of depravity. Although Meeks-Hakim testified that the respondent had changed, she offered no concrete examples demonstrating that he was rehabilitated or could safely parent his children. She testified that he was less emotional than he once was, but she acknowledged that she still "couldn't say he's not that emotional." Similarly, although she testified that the respondent told her he was trying to follow the judge's directives in this case, she did not testify that he succeeded in doing so. The value of this evidence in overcoming the presumption of depravity was questionable at best.

---

[7]*In re M.G.* is cited as persuasive authority in accordance with Illinois Supreme Court Rule 23(e)(1) (eff. Jan. 1, 2021).

¶ 50   Moreover, assuming Meeks-Hakim's testimony rebutted the presumption of depravity, the evidence, taken as a whole, was sufficient to prove by clear and convincing evidence that the respondent was still depraved. The State presented evidence of five felony convictions, two of which were for aggravated battery. In addition, Toohey testified that the respondent was hostile toward agency workers and was not cooperative in communicating with them. This evidence supports the court's observation that any change in the respondent's character was minimal. We therefore conclude that the evidence supported the court's finding of unfitness.

¶ 51                     B. The Dispositional Order in Zahir's Case

¶ 52   The respondent argues that the trial court abused its discretion in deciding not to place Zahir in the custody and guardianship of the respondent's sister, Nahseekah Johnson. As a threshold matter, we must determine whether he has standing to challenge the trial court's placement decision.

¶ 53   Standing requires an injury to a legally recognized right. *Greer v. Illinois Housing Development Authority*, 122 Ill. 2d 462, 492 (1988). A party only has standing if they have a real interest in the outcome of the controversy. *In re N.C.*, 2014 IL 116532, ¶ 42. Whether a party has standing is a question of law subject to *de novo* review. *Powell v. Dean Foods Co.*, 2012 IL 111714, ¶ 35.

¶ 54   The trial court found the respondent unfit and placed Zahir in the custody and guardianship of DCFS. Guardianship confers the duty and authority to act in the best interests of the minor, subject to residual parental rights and responsibilities, to make important decisions in matters having a permanent effect on the life and development of the minor and to be concerned with the minor's general welfare. 705 ILCS 405/1-3(8) (West 2024).

¶ 55    As an unfit parent, the respondent retains residual parental rights and responsibilities. These residual rights include the right to reasonable visitation, the right to consent to adoption, the right to determine the minor's religious affiliation, and the responsibility for the minor's support. *Id.* § 1-3(13). These residual rights do not include the right to determine the child's placement. Thus, we conclude the respondent lacks standing to challenge this aspect of the dispositional order.

¶ 56    Moreover, even if we were to review his claim, we would reject it. In determining the appropriate disposition, "the court's overriding concern is the best interest of the child." *In re M.P.*, 408 Ill. App. 3d 1070, 1073 (2011). On appeal, we will reverse the trial court's dispositional order only if we find that the court abused its discretion. *Id.* An abuse of discretion occurs "when no reasonable person would agree with [the court's] decision." *Id.* In this case, the trial court recognized that Johnson was an accomplished person and capable parent. However, the court also found that placing Zahir with her rather than in the custody of DCFS would limit the resources available to Zahir, separate him from his siblings, and remove him from the only home he had known. These concerns support the trial court's decision, and we cannot find that no reasonable person would agree.

¶ 57    The respondent takes issue with the court's finding that placing Zahir in a private guardianship with his aunt would effectively end the case and eliminate any possibility of reunification. He asserts that there is no indication that Johnson would be unwilling to facilitate Zahir's return to his custody. However, without DCFS services, it is doubtful the respondent would ever become a fit person to have custody of Zahir. Moreover, the respondent does not address the other concerns addressed by the trial court, all of which support its dispositional decision. See Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020) (providing that points not argued in an appellant's opening brief are forfeited). We find no abuse of discretion.

15

¶ 58                    III. CONCLUSION

¶ 59    For the foregoing reasons, we affirm the order terminating the respondent's parental rights

to Emanuel II and the dispositional order placing Zahir in the custody and guardianship of DCFS.


¶ 60    Affirmed.